UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NOMAR CAMILO; ROBERTO UBINAS,

       Plaintiff(s),

v.

ALBERT NIEVES; LINK DISTRIBUTORS, CORP.,

       Defendant(s).

Civil No. 10-2150 (DRD)

**OPINION AND ORDER**

Pending before the Court is plaintiffs' *Motion For Temporary Restraining Order And/Or Preliminary Injunction*, Docket No. 2, and *Defendants' Albert Nieves and Link Distributors Corp. Joint Opposition To Plaintiffs' Motion For Temporary Restraining Order And/Or Preliminary Injunction* ("Defendants' opposition"), Docket No. 15. For the reasons set forth below, the plaintiffs' motion for injunctive relief is DENIED.

**Factual and Procedural Background**

On November 24, 2010, plaintiffs, Nomar Camilo and Roberto Ubiñas (collectively "plaintiffs"), filed the instant *Verified Complaint*, Docket No. 1. On the same date, plaintiffs filed a *Motion For Temporary Restraining Order And/Or Preliminary Injunction* ("Plaintiffs' motion for injunctive relief"), Docket No. 2. On December 1, 2010, the Court set a Show Cause hearing for December 6, 2010 at 9:30 a.m., Docket No. 12.

The Show Cause hearing was held as scheduled on December 6, 2010. At the end of the day, and after a lengthy exchange amongst counsel and the undersigned, the parties submitted the case based solely on their arguments. The Court asked the parties to file simultaneous proposed orders

including findings of facts and conclusions of law by December 17, 2010.  *See* Minutes of December 6, 2011, Docket No. 17.  Defendants, Albert Nieves and Link Distributors Corp. timely filed the proposed order on December 17, 2010, *see* Docket No. 19.  Plaintiffs filed the proposed order on December 24, 2010, after seeking a timely extension of time granted by the Court, Docket entries No. 18, 20, 29.

In a nutshell, it appears that the plaintiffs and co-defendant Albert Nieves have known each other for sometime prior to the incorporation of Link Distributors Corp.  Plaintiffs allege that prior to the incorporation, the parties verbally agreed to some type of stock arrangement.

Link Distributors Corp. was incorporated on September 27, 2006, as a domestic for-profit corporation, with a business volume not to exceed three million dollars, Registry Number 165867. As of June 3, 2011, the record of the Puerto Rico Department of State further shows that Link Distributors Corp. is an active corporation.  *See* the Puerto Rico Department of State Official Website, to wit: www.estado.gobierno.pr.

In their injunctive relief, plaintiffs demand from the defendants "to allow Plaintiffs to exercise their rights as Link's majority stockholders; to call and participate in Link's stockholders' agreements; grant Plaintiffs access to Link's corporate books and financial records in order to ascertain the value of Link's business fair value."  *See* Docket No. 1, ¶ 7.  Plaintiffs also moved for the entry of an injunction order enjoining defendants from "selling Link's assets, encumbering, diverting, misappropriating, dissipating and otherwise wasting Link's funds; and to prohibit the issuance and sale or transfer of any additional stock of Link."  *See* Docket No. 1, ¶ 8. Moreover, plaintiffs seek the minimum amount of $67,000.00 "representing the purchase price paid by Plaintiffs for the securities in question and other compensatory damages;" the amount of

$300,000.00 for breach of contract, plus interest under the Puerto Rico Civil Code, 31 L.P.R.A. §§ 2294, 3018, 3052, 3371 and other applicable laws, and/or the "rescission of the stock purchase and the award of compensatory damages." *See* Docket No. 1, ¶¶ 11-13.

Defendants opposed plaintiffs' request for injunctive relief on the grounds, that *albeit* it is true that plaintiffs and Nieves indeed held conversations regarding the creation of a corporation, "[i]n no way throughout their relationship did Defendant Nieves intend to persuade Plaintiffs to 'commit to investing in the project.'" *See* Docket No. 15, ¶ 10. "Nieves only expressed that the best option was for him to create a corporation to be named Link Distributors." *See* Docket No. 15, ¶ 10. "**At that moment, Plaintiffs offered money to start his company which Nieves accepted in the form of a loan.**" (Emphasis supplied). *See* Docket No. 15, ¶ 10.

Nieves further alleges that he "never represented to Plaintiffs that they would be acquiring any of Link's stock, either before or after the creation of the corporation." *See* Docket No. 15, ¶ 11. "Nieves wanted to set up his own business and was receiving any help he could get to reach his goal." *Id.* "He [Nieves] honestly believed Plaintiffs' [could] help in this matter to be amicable and their initial start-up loan as both to help a friend get ahead, and to further advance their own business, since they were helping a future supplier of the equipment they need for their own corporation." *Id.* "**Plaintiffs had the means, opportunity, and knowhow to register the corporation, establish the records, have the alleged majority of the shares of the corporation that was later named Link Distributors, but they did not do it**." (Emphasis ours). *See* Docket No. 15, ¶ 12. "Plaintiffs provided start up money in the form of indebtness; Plaintiffs provided their technical knowledge and experience because of the personal relationship they established with Defendant." *See* Docket No. 15, ¶ 13. "[T]he initial loan made by Plaintiffs to Defendant was

3

months prior to the incorporation of the business, in June 2006, where a D/B/A account was opened and the only authorized signature to issue checks was that of Defendant Albert Nieves." *See* Docket No. 15, ¶ 14.  "No stock could've been purchased at said time, since the Corporation was not yet created." *Id*.  "The check with which Plaintiffs made the initial loan of $7,400 was made with a check issued from Kryonyx's[1] bank account, not the Plaintiffs'." *See* Docket No. 15, ¶ 15.  Nieves further alleges that several bank accounts were opened, and that the alleged "return on investment" account, "was opened in order for the corporation to deposit the repayment of the loan made by Plaintiffs." *See* Docket No. 15, ¶ 18.  Notwithstanding, Nieves alleges that only he "maintained control of all accounts, as sole stockholder, director, and officer of the Corporation." *See* Docket No. 15, ¶ 19.

On or about early in the year 2009, plaintiff Nomar Camilo asked Nieves whether he would employ his father Camilo Sr., as a salesperson in the business. *See* Docket No. 15, ¶ 20.  Nieves accepted, "[s]ince the Plaintiffs had been helping Nieves for years ... ." *Id.*  However, "[d]uring the course of Camilo Sr.' s employment, he informed Plaintiffs, about the internal business matters of the administration of the corporation." *See* Docket No. 15, ¶ 21.  "One of the matters informed by Camilo Sr. was, as it is alleged in the Verified Complaint, that Kryonyx' s competitors were receiving better deals from Link Distributors, Corp." *Id.*  "This appears to have angered Plaintiffs and triggered the chain of events that ended in the captioned case." *Id.*

---

[1] Kryonyx Corp. is a corporation created by plaintiffs on May 11, 1999, Registry No. 109226, as a domestic for-profit corporation, active, incorporated with no specific purpose, and with a business volume not to exceed three million dollars, according to the information provided by the Puerto Rico Department of State's webpage, as of June 8, 2011.

4

**Issues**

The issues pending are: (a) whether the plaintiffs are stockholders of the defendant Link Distributors Corp.; and (b) if plaintiffs are indeed stockholders of the defendant corporation, then whether there is federal jurisdiction under the Securities Exchange Act.

The Court finds that in order to determine whether there is federal jurisdiction, the Court must first determine whether the plaintiffs are indeed stockholders of the defendant corporation. For the reasons set forth below, the Court finds that the plaintiffs are not stockholders of Link Distributors Corp.. The applicable Puerto Rico corporate law requires that a verbal agreement for stock purchase, which has been entered into by the parties before the corporation is created, such as the one alleged by plaintiffs in the instant *Verified Complaint*, constitutes a subscription agreement under Puerto Rico law, and the law requires that said agreement must be in writing.

**Applicable Law and Discussion**

The Puerto Rico "General Corporations Law of 1995"[2] governs those corporations organized under this law which became effective on January 1, 1996 until January 1, 2010, when the new "General Corporations Law of 2009"[3] became effective. In the instant case, Link Distributors Corp. was incorporated on September 27, 2006, hence, the applicable law is the General Corporations Law of 1995. *See Santiago-Aponte v. Rodríguez Martínez*, 2011 TSPR 37, 2011 WL 1107074, n.1 (P.R., March 18, 2011). The Court notes, however, that the applicable sections of the corporations law, which are applicable to the instant controversy, are exactly the same under both the General Corporations Laws of 1995 and 2009.

---

[2] Law No. 144 of August 10, 1995, effective on January 1, 1996, 14 L.P.R.A. §§ 2601 *et seq.*

[3] Law No. 164 of December 16, 2009, effective on January 1, 2010, 14 L.P.R.A. §§ 3501 *et seq.*

Section 2777 of the General Corporations Law of 1995, clearly requires that any stock agreement reached by the incorporators either **prior to or after** the creation of the corporation must be in writing, and signed by the incorporators or their agent.

14 L.P.R.A. § 2777[4] provides:

> A subscription for stock of a corporation, made before or after the creation of the corporation, may not be enforced against the subscriber, unless the same is in writing and signed by the subscriber or his agent.

The Court further notes that "[u]nless otherwise provided by the terms of the subscription, a subscription for stock of a corporation to be created shall be irrevocable for a period of six (6) months from its date except with the consent of all other subscribers or the corporation." 14 L.P.R.A. § 2776.[5]

In the instant case, the plaintiffs' main allegations are:

"The telephone conversations between Plaintiffs and Nieves started as early as January 11, 2005, and continued on a weekly basis until May 31, 2006. In fact, Nieves held at least twenty-seven (27) telephone conversations with Camilo during said period." *See* Docket No. 1, ¶ 25. "From June 2006 forward, Nieves held over forty (40) telephone conversations with Plaintiffs each month." *See* Docket No. 1, ¶ 26. "In those conversations, Nieves expressed that the best option was for him to create a corporation, which was later named Link Distributors, and lured Plaintiffs into purchasing stock by fraudulently misrepresenting the proposed business." *See* Docket No. 1, ¶ 27. "According to the plan proposed, Camilo and Ubiñas would each own thirty-three percent (33%) of Link's

---

[4] *See* 14 L.P.R.A. § 3597 is the corresponding section under the General Corporations Law of 2009.

[5] *See* 14 L.P.R.A. § 3596 is the corresponding section under the General Corporations Law of 2009.

corporate stock, totaling sixty-six percent (66%). The other thirty-four percent (34%) would be owned by Link until Plaintiffs' initial investment was returned through the expected dividends." *See* Docket No. 1, ¶ 28. "Once this was accomplished, thirty-three percent (33%) of Link's stock would be acquired by Nieves and the remaining one percent (1%) would not be issued." *See* Docket No. 1, ¶ 29. "In consideration for said stock, Plaintiffs would provide the financial resources necessary to get the business started and man hours to complete said task." *See* Docket No. 1, ¶ 30. "**However, Link did not issue the related stock certificates to Plaintiffs**." *See* Docket No. 1, ¶ 35. "**Nieves sustains Plaintiffs never purchased Link's stock and that the only consideration Plaintiffs provided to Link was a loan to be used as capital; nothing more**." (Emphasis ours). *See* Docket No. 1, ¶ 37. "Nieves made the misrepresentations described herein in the course of the stock purchase with the intention of deceiving Plaintiffs' technical knowledge and years of experience in the telecommunications market." *See* Docket No. 1, ¶ 38. "Plaintiffs would have not purchased Link's stock but for the representations made to them by Nieves and these misrepresentations caused Plaintiffs to loose substantial amounts of money." *See* Docket No. 1, ¶ 39.

In *Santiago Aponte*, *supra*, the Court held that the existence of a for-profit corporation is not possible without stockholders. *See* 2011 WL 1117074, *1. The Court further held that the subscription agreements to purchase stock after the General Corporations Law of 1995 had to be in writing:

> On the other hand, for-profit corporations are engaged in operating businesses which will return a profit, to be distributed among its shareholders. Negrón Portillo,[6] *supra*, at 6. The shareholder is an owner of the corporation. Whoever holds title to the capital shares of the corporation has an interest or aliquot portion of its capital, a

---

[6] Luis Mariano Negrón Portillo, *Derecho Corporativo Puertorriqueño,* San Juan (2d. ed. 1996).

7

general right to share in its profits and in the distribution of its assets in case the corporation is liquidated. Díaz Olivo,[7] *supra*, at 148. "[A] share is an interest or quota in the property of the corporation belonging to a shareholder individually." *López Martínez v. Yordán*, 104 D.P.R. 594, 596 [4 P.R. Offic. Trans. 832, 835] (1976).

When a for-profit corporation is about to be created, its capital stock is acquired through a share subscription agreement. Shares from an existing corporation that intends to issue new shares of stock may also be acquired through a subscription agreement. Negrón Portillo, *supra*, at 254.

**The share subscription agreement is different from a contract of purchase and sale, being a contract to issue or create new shares as opposed to an agreement for the transfer of title to shares already in existence. The subscription agreement should indicate, at least in a general way, the nature and main purposes of the corporation to be formed, the amount of authorized capital, the kind and number of shares authorized, and the class, par value and number of shares subscribed for**. 4 *Fletcher Cyc Corp.* § 1363.10 (2005) at 25-26. (Emphasis ours).

**A contract of subscription is similar to any other contract, so the decisions run. If there is a valid consideration, the agreement of the parties, and a lawful object, the contract is perfected. It need not be written down, unless th charter of the corporation, the by-laws, <u>or the state laws so require</u>**. *Progreso Financiero v. Gómez*, 55 P.R.R. 819, 823 (1940). (Emphasis ours).

Section 5.17 of the General Corporations Law of 1995 (14 L.P.R.A. § 2777) specifically provides that **a subscription for stock of a corporation may not be enforced against the subscriber unless it is in writing**. **The terms of the subscription are irrevocable except by the consent of all other subscribers or the corporation**. Section 5.16 (14 L.P.R.A. § 2776). A subscriber may accede to the rights and obligations of shareholders, depending on the law, the corporate statutes or the subscription agreement. 4 *Fletcher Cyc Corp.*, *supra*, § 1375, at 49-52.[8] (Emphasis ours).

---

[7] C.E. Díaz Olivo, *Corporaciones*, Puerto Rico, Publicaciones Puertorriqueñas, 2005.

[8] This is an official translation graciously provided by the Puerto Rico Supreme Court.

In *Progreso Financiero*, *supra*, the defendant had agreed to purchase 25 shares, pursuant to the records of the plaintiff, although the defendant only paid for 5 shares; plaintiff issued a stock certificate on behalf of the defendant, who also subscribed several notes for the amount of the remaining shares. The defendant Gómez alleged that she never agreed to pay for the 25 shares, as this was merely a plaintiff's requirement in order for her to be appointed as a member of plaintiff's board of directors. The lower court ruled for plaintiff, as the notes executed by the defendant to pay for the remaining shares were due and payable, and pursuant to the notes' covenants, the notes were not subject to any condition nor were offered as a collateral of any debt. Hence, pursuant to the entry in plaintiff's stock registry; the plaintiff's rules and regulations; the payment of 5 shares, and the execution of the subsequent notes for the payment of the remaining 20 shares, the lower court held, as affirmed by the Puerto Rico Supreme Court, that the documents executed by the defendant Gómez showed that she indeed was a stockholder. Hence, the subscription contract for the purchase of stock was enforceable against the defendant Gómez. "A contract of subscription is similar to any other contract, so the decisions run. If there is a valid consideration, the agreement of the parties, and a lawful object, the contract is perfected. It need not be written down, unless the charter of the corporation, the by-laws, <u>or the state laws so require</u>." *Progreso Financiero v. Gómez*, 55 P.R.R. at 823. *See also* 14 L.P.R.A. § 2777.

In the instant case, the plaintiffs failed to show that they are indeed stockholders of the defendant Link Distributors Corp. Plaintiffs failed to present documentation leading the Court to find that indeed the parties met prior and after the incorporation of Link Distributors Corp., and that

9

a subscription agreement for the purchase of stock, as described in pages 6-7 *infra*,[9] was executed in writing.  Although the parties may have initially reached a verbal agreement, the same is not valid and enforceable under the General Corporations Law of 1995, 14 L.P.R.A. § 2777.  The Court further notes that the plaintiffs failed to present any evidence regarding the incorporation of Link Distributors Corp., such as, minutes, drafts of the stock subscription agreement, the by-laws of the corporation or any other corporate related document.   In sum, the plaintiffs failed to meet their burden by showing that they are the owners and stockholders of the defendant corporation.

The Court is not persuaded by plaintiffs' argument regarding the guaranty given in the defendants' bank account with Banco Popular of commercial/business account.  *See* Docket No. 1, Exhibit No. 1-7.  The fact that an individual guarantees the payment of a commercial debt does not translate into being an owner of a corporation nor a corporate  stockholder, particularly when there is no subscription agreement executed in writing stating that the loan provided by plaintiffs was in exchange for corporate shares.  On the contrary, the only evidence before the Court is that plaintiffs simply loaned moneys to the defendants, and Nieves had to repay said loan.  Plaintiffs failed to present evidence to the contrary.

Further, it is well settled that to grant a preliminary injunction relief, plaintiff must prevail under the standard as set forth in *Narrangansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991): (1) likelihood of success on the merits; (2) irreparable injury; (3) the injury outweighs any harm inflicted on the respondent; (4) the public interest most not be adversely affected.  *See Vaquería Tres Monjitas, Inc.; Suiza Dairy, Inc. v. Irizarry, et al.*, 587 F.3d 464, 482-483 (1st Cir.

---

[9] Plaintiffs' alleged verbal agreement constituted a pre-subscription agreement, as to how all the corporate shares were going to be distributed after the actual incorporation of Link Distributors Corp.

2009).   The *sine qua non* requisite and the most critical constitutes the probability of success. *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993). "In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief." *Weaver v. Henderson*, *supra*, at page 12. In *Braintree Laboratories, Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010), the Court held:

> It is true that we measure irreparable harm on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir.2009), such that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 75 (1st Cir. 1981).

In the instant case, plaintiffs have failed to meet the requirement of probability of success, as the Puerto Rico law requires that the subscription agreement for the purchase of stock, as described by plaintiffs, must be in writing in order to be enforceable against the subscribers. *See* 14 L.P.R.A. § 2777. In sum, plaintiffs have failed to meet the *sine qua non* requisite of likelihood of success on the merits, hence, the injunctive relief requested is not warranted.

### A Final Note

- *Laches*.

The certificate of incorporation of Link Distributors Corp. shows that it was registered on September 27, 2006. It is inexplicable that plaintiffs waited more than four years to take action and to inquire on the business status of Link Distributors Corp. "The application of the doctrine [of laches] is within the 'sound discretion' of the district court." *Puerto Rican-American Ins. Co. v. Benjamin Shipping Co., Ltd.*, 829 F.2d 281, 283 (1st Cir. 1987) (citing *Azalea Fleet v. Dreyfus Supply & Machinery Corp.*, 782 F.2d 1455, 1458 (8th Cir. 1986). Laches *per se* is a valid reason

to deny injunctive relief. In *Vaquería Tres Monjitas, Inc.; Suiza Dairy, Inc. v. Irizarry, et al.*, 587 F.3d 464, 480 (1st Cir. 2009), the Court held:

> The doctrine of laches may bar a claim that was raised after an inexcusable delay. 'In order for laches to apply, the district court must examine whether plaintiff's delay in bringing suit was unreasonable and whether defendant was prejudiced by the delay." *Puerto Rican-American Ins. Co. v. Benjamin Shipping Co., Ltd.*, 829 F.2d 281, 283 (1st Cir. 1987) (citing *Costello v. United States*, 365 U.S. 265, 282 (1961).

In the instant case, plaintiffs failed to explain why they waited more than five years from the date when Link Distributors Corp. was incorporated, to inquire as to the corporation's business operation; its financial status, specially to try to enforce the alleged rights of stockholders. Unfortunately, the Court has not been put in a position to determine whether the plaintiffs are stockholders of Link Distributors Corp., as the parties have failed to subscribe a written subscription agreement for the purchase of stock, or in exchange of the purchase of stock. Hence, the Court is constrained to deny the plaintiffs' injunctive relief based on the evidence before the Court.

- ***Security Exchange Act and Federal Jurisdiction.***

In view of the fact that the plaintiffs failed to show that they are stockholders of the defendant corporation, the Court finds that they are impaired to claim any violation under the Security Exchange Act. Hence, the Court finds that it does not have federal jurisdiction to entertain in this case.

### Conclusion

In view of the foregoing, plaintiffs' request for a temporary restraining order and/or preliminary injunction, Docket No. 2, is DENIED.

Plaintiffs are to show cause within fourteen (14) days, why the instant case is not to be

dismissed with prejudice, as the law is pellucidly clear that the subscription agreement, as the one described herein above, has to be in writing in order to be enforceable against others subscribers, pursuant to the General Corporations Law of 1995, Section 5.17 of the Law, 14 L.P.R.A. § 2777.

The Court recognizes that prior to the General Corporations Law of 1995, the agreement to purchase stock or a stock subscription agreement, could be reached verbally between the stockholders, under *Progreso Financiero v. Gomez*, 55 P.R.R. 819, 823 (1940). However, the Supreme Court of Puerto Rico has clearly held that such verbal stock agreement could be altered if "the state laws so require." *Progreso Financiero v. Gómez*, 55 P.R.R. at 823,[10] as reiterated by *Santiago Aponte v. Rodriguez Martinez*, 2011 WL 1117074, *1, *see* page 8 *infra*.

It is further clear that the alleged verbal agreement between the plaintiffs and Nieves occurred on or about January 11, 2005, and subsequently thereto Link Distributors Corp. was incorporated on September 27, 2006. The General Corporations Law of 1995, which is the applicable law that governs in the instant case, and which also establishes the requirement that the subscription agreements for the purchase of stock must be in writing, came into effect in January 1, 1996. That is, the statutory requirement that the subscription agreements for the purchase of stock must be in writing, has been in effect at least 10 years prior to the incorporation of Link Distributors Corp. Hence, the verbal subscription agreement allegedly entered by the parties, as to the purchase of stock

---

[10] For easy reference, the Court in *Progreso Financiero,* supra, at 823, held:

> A contract of subscription is similar to any other contract, so the decisions run. If there is a valid consideration, the agreement of the parties, and a lawful object, the contract is perfected. It need not be written down, unless the charter of the corporation, the by-laws, **or the state laws so require**. (Emphasis ours).

As stated above, the corporate law of Puerto Rico requires that the subscription agreement for the purchase of stock must be in writing. Even if the parties entered into a pre-incorporation subscription agreement before the incorporation of Link Distributors Corp., the subscription agreement has to be executed in writing, in order to be enforceable against the other subscribers, as required by 14 L.P.R.A. § 2777.

of Link Distributors Corp., is barred by the statute requiring contracts for the purchase and distribution of stock, to be in writing pursuant to the express mandate of the General Corporations Law of 1995.

    IT IS SO ORDERED.

    In San Juan, Puerto Rico, this 20th day of June, 2011.

                                                    s/Daniel R. Domínguez
                                                    DANIEL R. DOMINGUEZ
                                                    U.S. DISTRICT JUDGE